UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

TIMOTHY ALBRITTON,

               Plaintiff,

v.                                         Case No. 3:21-cv-712-MMH-JBT

CENTURION OF FLORIDA, et al.,

               Defendants.

_____

## **ORDER**

### I.    **Status**

Plaintiff Timothy Albritton, an inmate in the Florida Department of Corrections (FDOC), is proceeding on a pro se Second Amended Complaint against Centurion of Florida, LLC; Dr. E. Perez-Lugo; Errol Campbell; and Corizon Health, Inc. (Doc. 15; SAC).[1] Before the Court are Defendants' Motions to Dismiss. See Defendants Perez-Lugo, Campbell, and Centurion of Florida, LLC's Motion to Dismiss (Doc. 52); Defendants Corizon Health, Inc. and Dr. E.

---

[1] Based on the parties' settlement, the Court dismissed with prejudice the claims against the other named Defendants (Florida Department of Corrections, Julie Jones, Mark Inch, Ricky D. Dixon, and Thomas Reimers). See Notice of Settlement (Doc. 47); Order (Doc. 50).

Perez-Lugo's Motion to Dismiss the Complaint (Doc. 54).[2] Defendants Corizon and Perez-Lugo also filed a Consent Notice of Filing Documents in Support of Motion to Dismiss, which includes copies of Albritton's relevant grievances and responses thereto (Doc. 53). The Court advised Albritton that granting a motion to dismiss would be an adjudication of the case that could foreclose subsequent litigation on the matter and gave him an opportunity to respond. See Order (Doc. 17). Albritton responded in opposition to both Motions. See Motions in Opposition to Defendants' Motion to Dismiss (Docs. 61, 62).

## II.   Albritton's SAC

Albritton alleges that he was diagnosed with Hepatitis C (Hep-C or HCV) in June 2004, while housed at South Florida Reception Center. SAC at 18. He states that between 2005 and February 2007, his Hep-C was monitored but not treated. See id. at 18-19. On February 7, 2007, Albritton "agreed to wait six months until his next clinic and new lab results before deciding if he wanted his Hep-C treated with Pegelated Inteferon and Ribivarin." Id. at 19. At his next appointment, "his liver enzymes were almost back to normal." Id. From January 2009 through July 2010, Albritton's appearance was "good" and "his

---

[2] For the time period of September 15, 2013 to April 24, 2016, Corizon's counsel represents Defendant Perez-Lugo. See Doc. 54 at 1 n.1; see also Notice of Appearance (Doc. 18). For claims after April 24, 2016, Centurion's counsel represents Defendant Perez-Lugo. See Notices of Appearance (Docs. 25-27).

Hep-C was asymptomatic," so the doctor did not recommend any treatment. Id.

In January 2011, the FDOC transferred Albritton to Suwannee Correctional Institution (SCI), and in June 2011, his "HCV viral load test results [were] noted as being high." Id. at 20. On September 12, 2012, testing determined that Albritton "had genotype 3a."[3] Id. In December 2014, Albritton's medical records reflect that his Hep-C was "'well controlled.'" Id.

According to Albritton, in March 2015, his blood test revealed that "his Hep-C was detected at over 29 million virus per IU/ml." Id. Albritton's medical records show that on May 26, 2015, his "Hep-C lab results were high and [he] was requesting Inteferon drug therapy." Id. Albritton's request, however, was denied, because "his Hep-C was allegedly controlled." Id. Tests revealed in September 2015 that Albritton's "liver enzymes were elevated," but medical staff at SCI continued to deny his requests for Interferon drug therapy from January 2016 to November 2017, while documenting "that his Hep-C was 'controlled' and HCV [wa]s 'Good.'" Id. at 20-21. "However on [Albritton's] November 25th, 2017 blood test it was found that his liver fibrosis score [wa]s 0.65, fibrosis Stage [wa]s an F3, advanced fibrosis, severe activity." Id. at 21; see id. at 24 (alleging that in August, September, and December 2017, testing

---

[3] Later in the SAC, Albritton alleges that on March 12, 2010, he was diagnosed with Hep-C Genotype 1A, "a more severe type of the viral disease and that may be associated with decreased responsiveness to therapy." SAC at 23.

showed Albritton had a "serious" Hep-C viral load, severe fibrosis, and cirrhosis). Medical staff still did not provide him any treatment, and on May 7, 2018, staff indicated that his Hep-C was "'good/stable.'" Id. at 21.

Albritton completed lab tests on August 8, 2018, to determine his viral load. Id. On August 13, 2018, his records show "he was a F-3" and he again requested treatment. Id. He finally began a treatment protocol on September 7, 2018. Id.[4] On December 12, 2019, an ultrasound showed that Albritton's spleen was mildly enlarged, and on June 5, 2019, an ultrasound showed "mi[l]dly increased echotexture of the liver which may represent hepatic steatosis. Borderline enlarged Spleen." Id. at 21, 22.

Albritton alleges that due to the FDOC, Corizon, and Centurion failing to provide "the well known proper level of medical care for Hep-C . . . in a timely manner," he may be "near very possible fatal liver disease." Id. at 22. He asserts that he has "compensated cirrhosis, level 4 fibrosis, and in the future possible decompensated cirrhosis and liver cancer." Id. at 23; see id. at 26 ("The denial of care, in favor of profit[,] has resulted in [Albritton's] torment and sorrow and irreparable liver damage, and possible early loss of life."). Albritton also states that he is "hopefully[] cured of the viral infection" after receiving

---

[4] Albritton wrote "December 7, 2019," as the date he began treatment, but this appears to be a scrivener's error as he later notes that he received treatment from September 7, 2018 to December 7, 2018. SAC at 29.

4

treatment but that he "is still an F4 on the METAVIR scale and has compensated cirrhosis of his liver." Id. at 26.

Albritton contends that the FDOC, Corizon, and Centurion "had a policy, practice, and custom established by prior litigation of not providing [direct-acting antiviral (DAA(s))] drugs to inmates with chronic HCV." Id. at 27; see also id. at 23 (alleging that "Corizon and Centurion utilized a simple policy and practice to deny care by institutional physicians," which "was then ratified by" the FDOC Secretary). Albritton contends that Corizon's and Centurion's delay and "denial of the well known proper level of medical care," which was prescribing DAAs, "was the proximate cause of the irreparable damage to [his] liver." Id. at 3-4, 5; see id. at 26 ("Defendants Corizon and Centurion's deliberate choice to ignore the requirement of [Albritton's] care by not administering DAA[]s until 12-07-2018 when DAAs were available in 2013 was a 'regulatory measure.'").

He asserts that Defendant Perez-Lugo, as the Chief Health Officer, "specifically denied and delayed [Albritton's] treatment with the well known proper level of medical treatment for the disease Hepatitis-C [(DAAs)], known since 2014." Id. at 6. As to Defendant Campbell, Albritton alleges that Campbell, as the Medical Director, assisted "in setting the rules, supplied by e-mail memos, which will be obtained through discovery," directing the Chief

Health Officers at FDOC institutions "to delay and thus deny [Albritton] and all other Hep-C infected FDOC inmates the proper well known level of medical treatment." Id. at 9. Albritton contends that both Perez-Lugo and Campbell concealed necessary information from the Federal Bureau of Prisons and/or the Center for Disease Control regarding Hep-C treatment with DAAs to foreclose Albritton from finding out about the seriousness of his disease. Id. at 6, 9.

Albritton asserts one cause of action against Defendants Centurion and Corizon – an "Eighth Amendment Monell[5] Claim." Id. at 37. Albritton alleges that "Centurion and Corizon and their policymakers knew about and enforced policies, practices, and / or custom[s] that exhibited deliberate indifference to [Albritton's] serious medical needs." Id. He contends that through their employees, Centurion and Corizon "intentionally delayed, failed, and refused to provide [Albritton] with treatment that will address his serious medical needs despite knowing that their actions would result in [Albritton's] continued suffering and exposure to liver failure and its symptoms, liver cancer, and death." Id. He asserts that he "did not receive the constitutionally required DAA treatment solely because of the cost of the treatment." Id. at 39. He concludes that Centurion and Corizon "implemented and enforced" the

---

[5] Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978).

policies, practices, or customs that resulted in his harm. Id. As relief, he seeks compensatory and punitive damages. Id. at 39-40.

Albritton does not specifically allege any claims against Defendants Perez-Lugo and Campbell. He does, however, seek compensatory and punitive damages from them. Id. at 40-41.

### III.   Motion to Dismiss Standard

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Nonetheless, the plaintiff must still meet some minimal pleading requirements. Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted). Indeed, while "[s]pecific facts are not necessary[,]" the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when

7

the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 556).

A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" <u>Twombly</u>, 550 U.S. at 555 (internal quotations omitted); <u>see also</u> <u>Jackson</u>, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." <u>Iqbal</u>, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" <u>Id.</u> at 678 (quoting <u>Twombly</u>, 550 U.S. at 570). And, while "[p]ro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed," <u>Tannenbaum v. United States</u>, 148 F.3d 1262, 1263 (11th Cir. 1998), "'this leniency does not give the court a license to serve as de facto counsel for a party or to rewrite an otherwise deficient pleading in order to

sustain an action.'" <u>Alford v. Consol. Gov't of Columbus, Ga.</u>, 438 F. App'x 837, 839 (11th Cir. 2011)[6] (quoting <u>GJR Invs., Inc. v. Cnty. of Escambia, Fla.</u>, 132 F.3d 1359, 1369 (11th Cir. 1998) (internal citation omitted), <u>overruled in part on other grounds as recognized in</u> <u>Randall</u>, 610 F.3d at 706).

## IV.    Parties' Positions

Defendants Centurion, Perez-Lugo, and Campbell argue that Albritton fails to state a claim against them. <u>See</u> Doc. 52 at 4-13. Specifically, Perez-Lugo and Campbell argue that Albritton has not included any factual allegations against them or named them in any count. <u>See</u> <u>id.</u> at 7. Centurion argues that Albritton "fail[s] to sufficiently allege the existence of a Centurion policy or custom." <u>Id.</u> at 9. Centurion further argues that "it appears [] Albritton is attempting to hold Centurion liable for FD[O]C's policy or custom." <u>Id.</u> at 10 (emphasis removed). Centurion reasons that "whatever policy [] Albritton is attempting to allege in the [SAC] predates Centurion's contract with FD[O]C, as it was used by Centurion's predecessor, Corizon. Thus, the policy to which [] Albritton refers cannot be that of Centurion." <u>Id.</u> at 11.

---

[6] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060-61 (11th Cir. 2022); <u>see generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Defendants Corizon and Perez-Lugo argue that the SAC is a "shotgun pleading" and that Albritton "makes no claim concerning [Perez-Lugo] in the [SAC]." Doc. 54 at 5. Corizon further contends that Albritton failed to exhaust his administrative remedies as to his claim against Corizon prior to filing this case. See id. at 6-8. Finally, Corizon argues that Albritton's claim is untimely because it was filed more than four years after Corizon ceased providing medical services to FDOC inmates. See id. at 8-11.

Albritton responds that he has stated a claim against Perez-Lugo by pointing to his allegations on pages 5-7 and 20-21[7] of his SAC. See Doc. 61 at 6-8; see also Doc. 62 at 4-5. Likewise, Albritton argues that he stated a claim against Defendant Campbell and cites to his allegations on pages 8-9 of the SAC. See Doc. 61 at 8-9. He asserts that both Perez-Lugo and Campbell "were well aware of [his] serious medical need based on all the lab reports generated over the years," and they "were deliberately indifferent to those medical needs which is shown by their actions and/or inactions" resulting in Albritton's "increased Fibrosis level and . . . damage to [his] liver." Id. at 10.

Albritton also argues that he stated a claim against Centurion. He contends that "[u]nder the terms of its contract with FDOC, Centurion and its healthcare providers must follow FDOC policies, procedures, and directives."

---

[7] Defendant Perez-Lugo is not mentioned on pages 20-21 of the SAC.

<u>Id.</u> at 11. Albritton contends he sufficiently alleged "that Centurion had a policy or custom of not providing treatment to inmates with Chronic HCV and Centurion[']s sordid history of failing to treat and provide inmates with the readily available DAA[]s . . . goes back to 2013 when the D[A]A[]s first became available." <u>Id.</u> He also asserts that through discovery, he will be able to prove his assertions with respect to the alleged policy and custom, including that Centurion used "the same policy, practice, or custom of not providing DAA drugs to inmates as the previous healthcare provider (Corizon)." <u>Id.</u> at 12. Albritton contends that in his SAC, he alleges that Centurion's employees "repeatedly told" him that his Hep-C was under control, and they "systematically refused treatment based on Centurion's policy or custom of providing inmates with false[,] misleading[,] or inaccurate information just to save money." <u>Id.</u>

In response to Corizon's arguments, Albritton alleges that his SAC is not a shotgun pleading. <u>See</u> Doc. 62 at 2-5. He contends that his allegations are sufficiently clear to reflect that Corizon had a policy, custom, or practice to delay or deny medical care to inmates with Hep-C which resulted in Albritton's injuries. <u>See</u> <u>id.</u> at 3-4. Additionally, Albritton contends that he properly exhausted his administrative remedies prior to filing this case. <u>See</u> <u>id.</u> at 5-8. He asserts that he is not required to name a specific defendant in a grievance

or file multiple grievances to exhaust an ongoing issue. See id. at 7-8. According to Albritton, his formal grievance and subsequent appeal (Docs. 53-3, 53-4) sufficiently exhausted his claims. See Doc. 62 at 7. Finally, as to Corizon's argument that this case was untimely filed, Albritton asserts that medical staff continually provided him with false information regarding his Hep-C and that the delay and denial of his treatment was ongoing. See id. at 8-11.

## V.   Analysis

### a. Defendants Perez-Lugo and Campbell

According to Defendants Perez-Lugo and Campbell, Albritton fails to include sufficient factual allegations against them to state a claim, and he also fails to include them in any counts alleging a cause of action. The Court previously advised Albritton that if he sought relief from a defendant, he must factually describe the actions or omissions of each named defendant that allegedly violated his rights and raise a claim against each defendant. See Orders to Amend (Docs. 8, 12). The Court further advised Albritton that conclusory statements are insufficient to state a claim. See Order to Amend (Doc. 12). Nevertheless, the SAC does not include any specific claims against Perez-Lugo or Campbell. Additionally, Albritton does not allege that Perez-Lugo and Campbell were personally involved in his medical care. And insofar as Albritton attempts to hold them liable based on their supervisory positions,

he cannot do so. See Ingram v. Kubik, 30 F.4th 1241, 1254 (11th Cir. 2022) ("Supervisory officials are not vicariously liable under section 1983 for the unconstitutional acts of their subordinates."); see also Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).

Moreover, Albritton's "factual allegations" against these two Defendants are conclusory. For example, Albritton simply concludes that Perez-Lugo and Campbell were responsible for the denial and delay of his Hep-C treatment and they concealed information relating to available treatments. The only somewhat specific factual allegation Albritton provides is that Campbell assisted "in setting the rules." SAC at 9. Still, Albritton's allegations are insufficient to suggest a sufficient causal connection between the actions of Perez-Lugo or Campbell and the alleged unlawful conduct here. See Dickinson v. Cochran, 833 F. App'x 268, 272 (11th Cir. 2020) (discussing the "three ways to establish a causal connection between a supervisor's actions and the unlawful conduct"). Even liberally construing Albritton's allegations, the Court finds that given Albritton's failure to allege any claims against Perez-Lugo or Campbell and given his failure to include sufficient factual allegations against them, Defendants' Motions seeking to dismiss any claims against Perez-Lugo and Campbell are due to be granted.

### b. Centurion

Centurion argues that Albritton fails to allege facts supporting his assertion that Centurion had a policy or custom to deny him proper medical care, and that Albritton is attempting to hold Centurion liable for FDOC's policy. See Doc. 52 at 8-13. At this stage of the proceeding, the Court is required to accept the factual allegations set forth in the SAC as true. See Iqbal, 556 U.S. at 678. Doing so, the Court finds that Albritton has sufficiently stated a claim against Centurion. Indeed, Albritton alleges that Centurion had a cost-saving policy, custom, or practice of denying appropriate medical care to inmates with Hep-C, and that this policy, custom, or practice caused Albritton's injuries. See Denno v. Sch. Bd. of Volusia Cnty., Fla., 218 F.3d 1267, 1276 (11th Cir. 2000) (recognizing that under Monell, a plaintiff must allege that the constitutional violation was a result of "an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law"). Albritton is not required to prove at this stage that Centurion had a custom, policy, or practice of delaying or denying appropriate medical care— and whether he will ultimately be able to do so is best left for a determination

14

on summary judgment or at trial.[8] Considering his allegations on the whole, taken as true at this stage of the proceeding, the Court finds that Albritton has sufficiently alleged a claim against Centurion.

Additionally, relying on litigation from the Northern District of Florida, Centurion argues that Albritton attempts to hold it liable based on FDOC's policy. See Doc. 52 at 12 (citing Hoffer v. Inch, 382 F. Supp. 3d 1288, 1294 (N.D. Fla. 2019), rev'd in part, vacated in part sub nom. Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263 (11th Cir. 2020); Hoffer v. Jones, 290 F. Supp. 3d 1292, 1300 (N.D. Fla. 2017)). The Court finds this argument unpersuasive for the following reasons. First, the FDOC was the only defendant named in the Hoffer litigation. Second, the fact that the FDOC was not treating inmates with Hep-C due to a lack of funding does not necessarily mean that Centurion also did not have an unconstitutional policy, custom, or practice of not providing appropriate medical care to inmates with Hep-C. See Spencer v. Corizon Health, Inc., No. 3:17-cv-73-BJD-PDB, 2022 WL 2047861, at *5 (M.D. Fla. June 7, 2022). Thus, the Court will deny Centurion's Motion to the extent it seeks to dismiss the claims against it.

---

[8] Most of the cases Centurion relies on (McDowell v. Brown, 392 F.3d 1283 (11th Cir. 2004); Howell v. Evans, 922 F.2d 712 (11th Cir. 1991); and Williams v. Guard Bryant Fields, 535 F. App'x 205 (3d Cir. 2013)) were decided on motions for summary judgment.

### c. Corizon

#### i. Shotgun Pleading

Corizon argues that Albritton's SAC is a shotgun pleading because Albritton incorporates "paragraphs 1 to 52" in his claims against Corizon and Centurion; yet paragraphs 22 to 52 are claims against other Defendants[9] and "there are no paragraphs 1 to 11." Doc. 54 at 5.

Reading Albritton's allegations on the whole and considering his pro se status, the Court finds the SAC is not due to be dismissed as a shotgun pleading. Albritton's allegations as to Corizon are clear—Corizon had a custom, policy, or practice to deny or delay medical care to inmates with Hep-C based on cost. Albritton's contentions provide Corizon "notice as to the claim being asserted against [it] and the grounds on which [the claim] rests." Evans v. McClain of Ga., Inc., 131 F.3d 957, 964 n.2 (11th Cir. 1997) (internal quotations and citation omitted). Thus, the Court declines to dismiss the SAC as a shotgun pleading.

#### ii. Exhaustion

Corizon argues that Albritton failed to exhaust his administrative remedies as to the claims against Corizon prior to filing this case. See Doc. 54

---

[9] Notably, paragraphs 22-52 are claims against the FDOC which have been resolved. See Order (Doc. 50).

at 6-8. Corizon's sole contention is that Albritton's formal grievance and appeal filed in November 2020, "questioning why he was not provided treatment by Codefendant Centurion, . . . cannot be read to include Corizon's time providing medical care, which ended 54 months earlier." Id. at 8.

The Prison Litigation Reform Act (PLRA) requires an inmate wishing to challenge prison conditions to first exhaust all available administrative remedies before asserting any claim under 42 U.S.C. § 1983. See 42 U.S.C. § 1997e(a). Nevertheless, a prisoner is not required to plead exhaustion. See Jones v. Bock, 549 U.S. 199, 216 (2007). Instead, the United States Supreme Court has recognized "failure to exhaust is an affirmative defense under the PLRA[.]" Id. Notably, exhaustion of available administrative remedies is "a precondition to an adjudication on the merits" and is mandatory under the PLRA. Bryant, 530 F.3d at 1374. Not only is there an exhaustion requirement, "the PLRA exhaustion requirement requires proper exhaustion." Woodford v. Ngo, 548 U.S. 81, 93 (2006).

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which "means using all steps that the agency holds out, and doing so properly (so

> that the agency addresses the issues on the merits)."
> Pozo,[10] 286 F.3d, at 1024. . . .

Woodford, 548 U.S. at 90. And, "[p]roper exhaustion demands compliance with

an agency's deadlines and other critical procedural rules . . . ." Id. As such, the

United States Supreme Court has emphasized:

> Courts may not engraft an unwritten "special
> circumstances" exception onto the PLRA's exhaustion
> requirement. The only limit to § 1997e(a)'s mandate is
> the one baked into its text: An inmate need exhaust
> only such administrative remedies as are "available."

Ross v. Blake, 136 S.Ct. 1850, 1862 (2016).

The Eleventh Circuit has explained the two-step process that the Court

must employ when examining the issue of exhaustion of administrative

remedies.

> In Turner v. Burnside we established a two-step
> process for resolving motions to dismiss prisoner
> lawsuits for failure to exhaust. 541 F.3d at 1082.[11]
> First, district courts look to the factual allegations in
> the motion to dismiss and those in the prisoner's
> response and accept the prisoner's view of the facts as
> true. The court should dismiss if the facts as stated by
> the prisoner show a failure to exhaust. Id. Second, if
> dismissal is not warranted on the prisoner's view of
> the facts, the court makes specific findings to resolve
> disputes of fact, and should dismiss if, based on those
> findings, defendants have shown a failure to exhaust.
> Id. at 1082-83; see also id. at 1082 (explaining that

---

10 Pozo v. McCaughtry, 286 F.3d 1022 (7th Cir. 2002).

11 Turner v. Burnside, 541 F.3d 1077 (11th Cir. 2008).

defendants bear the burden of showing a failure to exhaust).

Whatley v. Warden, Ware State Prison, 802 F.3d 1205, 1209 (11th Cir. 2015); see Pavao v. Sims, 679 F. App'x 819, 823-24 (11th Cir. 2017) (per curiam).

State law "determines what steps are required to exhaust." Dimanche v. Brown, 783 F.3d 1204, 1207 (11th Cir. 2015); see also Jones, 549 U.S. at 218 (stating that "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion"). The FDOC provides an internal grievance procedure for its inmates. See Fla. Admin. Code r. 33-103.001 through 33-103.018. Generally, to properly exhaust administrative remedies, a prisoner must complete a three-step sequential process. First, an inmate must submit an informal grievance to a designated staff member at the institutional level. See Fla. Admin. Code r. 33-103.005. If the issue is not resolved, the inmate must submit a formal grievance at the institutional level. See Fla. Admin. Code r. 33-103.006. If the matter is not resolved at the institutional level, the inmate must file an appeal to the Office of the FDOC Secretary. See Fla. Admin. Code r. 33-103.007.

Under certain specified circumstances, an inmate can bypass the informal-grievance stage and start with a formal grievance at the institutional level. See Fla. Admin. Code r. 33-103.005(1); 33-103.006(3). These

circumstances include a "grievance of an emergency nature, grievance of reprisal," and a "medical grievance." Fla. Admin. Code r. 33-103.005(1).

On May 4, 2018, Albritton submitted a formal grievance regarding the "failure to treat [his] chronic illness, Hepatitis C." Doc. 53-2 at 1. He complained that he was last seen in September 2017, and that "chronic care clinic requires medical appointments to be scheduled every 90 days." Id. He requested to be seen by medical staff immediately, treatment to cure his Hep-C, and damages. Id. Albritton's grievance was denied, id. at 2, but he failed to appeal that denial.

Albritton did not complete another grievance regarding medical care for his Hep-C until November 6, 2020. See Doc. 53-3 at 1. In that formal grievance, he alleged that the FDOC and Centurion "failed to provide the necessary treatment for [his Hep-C] in a timely manner, because of cost concerns." Id. He stated that he was only treated due to a federal court order. Id. He further asserted that had he been treated "after the release of DAAs to the public or when Centurion signed the contract with FDOC [his] disease would not have progress[ed] to advanced liver damage and cause [him] to be monitor[ed] postcare for liver cancer and other medical issues the rest of [his] life." Id. (some punctuation modified). He stated that "[y]our over[r]iding concerns for cost associated with denial of treatment has caused unwanted pain[,]

suffering[,] and quality of life," and he requested $100,000. <u>Id.</u> On November 23, 2020, Dr. E.L. Toledo denied Albritton's grievance, stating: "[Y]our Hepatitis C treatment was handled in accordance with FD[O]C procedures and applicable treatment protocols." <u>Id.</u> at 2.

Albritton submitted an appeal:

> This is a[] grievance appeal of the direct medical grievance filed at the institutional level (Log #2011-213-044) in accordance with the Florida Administrative Code, Chapter 33-103.
>
> First, the FD[O]C procedures and applicable treatment protocols were found to be unconstitutional by Federal Court in <u>Hoffer v. Jones</u>. Secondly the attached response is flawed because it does not address the initial issue raised in the formal grievance, i.e., timely treatment prior to advance damage occurring to my liver over concerns of cost. The Department, its institutions and contracted health care provider (Centurion of Florida) had adopted an unofficial custom [and] practice of refusing to treat any HCV inmate until ordered by the Federal Court in December of 2017. Both entities had been put on notice of the medical issues involved and their liability and deliberately disregarded this information.
>
> Had I been timely treated, my disease would not have advanced to severe damage requiring life time postcare for potential liver cancer and other health issues. I request the same relief as the formal grievance.

Doc. 53-4 at 1 (some capitalization and punctuation modified). The appeal was denied. <u>Id.</u> at 2.

Albritton argues that he properly exhausted his administrative remedies by pointing to his November 2020 formal grievance and appeal. The Court finds that Albritton's allegations, taken as true, preclude dismissal at the first step of <u>Turner</u>. As such, the Court proceeds to <u>Turner</u>'s second step. Albritton does not dispute that his May 2018 formal grievance did not exhaust his administrative remedies because he did not file an appeal after that formal grievance was denied. And both parties appear to recognize that Albritton's November 2020 formal grievance and appeal exhausted his administrative remedies with respect to his claim regarding the denial and delay of treatment for his Hep-C—the issue is whether it exhausted such claims against Corizon given that Corizon stopped providing medical care in Florida prisons in 2016. <u>See</u> Doc. 54 at 8 (arguing that the November 2020 formal grievance and appeal "cannot be read to include Corizon's time providing medical care, which ended 54 months earlier").

While Albritton only named the FDOC and Centurion in his grievances, he is not required to specifically name a potential defendant. <u>See</u> <u>Parzyck v. Prison Health Servs., Inc.</u>, 627 F.3d 1215, 1218 (11th Cir. 2010) ("A prisoner need not name any particular defendant in a grievance in order to properly exhaust his claim."). Thus, that he did not specifically name Corizon is of no moment. Albritton is only required to alert prison officials to the problem and

22

give them an opportunity to resolve it. <u>See</u> <u>id.</u> at 1218-19. He did so by complaining about the delay in receiving treatment for his Hep-C. And he specifically stated that had he "been treated after the release of DAA[]s to the public," his Hep-C "would not have progress[ed] to advanced liver damage." Doc. 53-3 at 1. According to Albritton, DAAs were available around 2013 or 2014, <u>see</u> SAC at 6, 26-27, which includes Corizon's time as FDOC's medical provider. Thus, Corizon's Motion is due to be denied in this regard.

### iii.  Timeliness

Corizon argues that Albritton filed this case beyond the four-year statute of limitations, and thus, this case should be dismissed as untimely. <u>See</u> Doc. 54 at 8-11. Corizon contends that because it stopped providing medical care in Florida prisons in May 2016, Albritton was required to file suit no later than May 2020. <u>See</u> <u>id.</u> at 11. However, Albritton did not file this case until July 16, 2021 (mailbox rule).

The applicable statute of limitations is four years, and the Court applies federal law to determine when the statute of limitations begins to run. "Generally, 'the statute of limitations does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" <u>Lovett v. Ray</u>, 327 F.3d 1181, 1182 (11th Cir. 2003) (quoting <u>Rozar v. Mullis</u>, 85 F.3d 556, 561-62

(11th Cir. 1996)). "The continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period. When the violation alleged involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the unlawful conduct ceases." Robinson v. United States, 327 F. App'x 816, 818 (11th Cir. 2007) (citations omitted); see Baker v. Sanford, 484 F. App'x 291, 293 (11th Cir. 2012) (recognizing that "an 'allegation of a failure to provide needed and requested medical attention constitutes a continuing tort, which does not accrue until the date medical attention is provided'") (quoting Lavellee v. Listi, 611 F.2d 1129, 1132 (5th Cir. 1980)).

Albritton contends that Defendants, including Corizon, continually delayed and denied him treatment for his Hep-C and actively concealed information from him. Given his allegations, taken as true at this juncture, the Court declines to find Albritton's claim barred by the statute of limitations.

Accordingly, it is

**ORDERED**:

1.  Defendants Perez-Lugo, Campbell, and Centurion of Florida, LLC's Motion to Dismiss (Doc. 52) is **GRANTED in part and DENIED in part**. The Motion is **GRANTED to the extent** that all claims against

Defendants Perez-Lugo and Campbell are **DISMISSED without prejudice**. The Motion is otherwise **DENIED**.

2.    Defendant Corizon Health, Inc. and Dr. E. Perez-Lugo's Motion to Dismiss the Complaint (Doc. 54) is **GRANTED in part and DENIED in part**. The Motion is **GRANTED to the extent** that all claims against Defendant Perez-Lugo are **DISMISSED without prejudice**. The Motion is otherwise **DENIED**.

3.    The **Clerk** shall terminate Defendants Perez-Lugo and Campbell as parties to this case.

4.    Defendants Centurion and Corizon shall answer the Second Amended Complaint by **February 7, 2023**.

5.    A separate scheduling order will enter.

**DONE AND ORDERED** at Jacksonville, Florida, this 4th day of January, 2023.

MARCIA MORALES HOWARD
United States District Judge

JAX-3 1/4
c:
Timothy Albritton, #479916
Counsel of Record